# United States Court of Appeals
## For the First Circuit

---

No. 13-2163

GREEN MOUNTAIN REALTY CORP.,

Plaintiff, Appellant,

v.

JOHN S. LEONARD, Member and Chairman of Town of Milton Board of
Appeals; SARA L. HARNISH, Member of Town of Milton Board of
Appeals; VIRGINIA M. DONAHUE KING, Member of Town of Milton Board
of Appeals; BRIAN M. HURLEY, Member of Town of Milton Board of
Appeals; JEFFREY B. MULLAN, Member of Town of Milton Board of
Appeals; FRANCIS C. O'BRIEN, Member of Town of Milton Board of
Appeals; EMANUEL ALVES, Member of Town of Milton Board of
Appeals; STEVEN M. LUNDBOHM, Member of Town of Milton Board of
Appeals; TOWN OF MILTON, MASSACHUSETTS; MILTON CONSERVATION
COMMISSION; MILTON BOARD OF APPEALS,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Thompson, Circuit Judge,
Souter, Associate Justice,[*]
Stahl, Circuit Judge.

---

Robert D. Ciandella, with whom Robert M. Derosier and Donahue,
Tucker & Ciandella, PLLC, were on brief, for appellant.
Brandon H. Moss, with whom John P. Flynn and Murphy, Hesse,
Toomey & Lehane, LLP were on brief, for appellees.

---

[*] The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

April 23, 2014

**THOMPSON, <u>Circuit Judge</u>**.  This dispute over the location and height of a proposed cellular phone tower has been ongoing since 2009 and is now before us for the second time.  In a nutshell, appellant Green Mountain Realty Corp. ("GMR") originally sought to erect a 140-foot cell phone tower between Interstate Route 93 South ("I-93") and the on-ramp by Exit 3 in Milton, Massachusetts.  The tower's asserted purpose was to fill a significant gap in the wireless coverage provided by T-Mobile's and MetroPCS's networks.  Milton's Board of Appeals ("BOA") and Conservation Commission ("MCC")--the two local entities whose approval GMR needed before it could begin construction--rejected the 140-foot proposed tower.  GMR turned to the federal courts, asserting the denials were preempted by federal law and naming as defendants the BOA, the MCC, the individual members of both, and the Town of Milton itself (collectively, "Milton").  The district court granted summary judgment to Milton, finding that the BOA's and MCC's decisions were supported by substantial evidence in the administrative record, and GMR appealed to us.

Addressing this matter the first time, we upheld the "substantial evidence" findings but remanded to the district court with instructions to consider whether the local authorities' denials resulted in an "effective prohibition" of personal wireless services in contravention of the federal Telecommunications Act of 1996, 47 U.S.C. § 332(7)(B)(i)(II).  The parties filed cross-

-3-

motions for summary judgment upon their return to the district court. After holding a hearing, the district court learned that T-Mobile and MetroPCS had merged into a single company--T-Mobile USA--and ordered the parties to brief whether and how the merger affected the pending cross-motions.

GMR then submitted evidence indicating that, as a result of the merger, a shorter tower would suffice to eliminate the coverage gap in T-Mobile's network. Milton took the position that GMR must file a brand new application, as the original request was for a 140-foot tower only. The district court denied GMR's motion for summary judgment and granted Milton's, thereafter entering judgment in favor of Milton and triggering GMR's second appeal to this Court.

Having carefully reviewed the record, we conclude the district court erred when it granted Milton's motion for summary judgment. Based on the summary judgment record and the supplemental materials bearing on the effective prohibition claim, a reasonable finder of fact could have found that the BOA's and MCC's denials rejected the only feasible plan for remedying the coverage gap and, therefore, constituted an unlawful effective prohibition of T-Mobile's provision of wireless services unless GMR was allowed to build a cell phone tower that was somewhere between 90 and 120 feet tall. Accordingly, we affirm the district court's denial of GMR's motion for summary judgment, reverse its grant of

summary judgment in favor of Milton, vacate the judgment in Milton's favor, and remand for further proceedings consistent with this opinion.

**I.**

**BACKGROUND**

We previously set forth many of the background facts in Green Mountain Realty Corp. v. Leonard, 688 F.3d 40 (1st Cir. 2012). In order to provide context to the instant appeal, we sketch the outline of what has already transpired, at least insofar as is relevant here. Curious readers seeking additional details-- and they are myriad--should refer directly to our 2012 opinion.

### a. The Initial Proposal

GMR is not a telecommunications provider. Instead, it owns and manages personal wireless communications facilities ("PWCFs"), known in common parlance as cell phone towers. It makes money by leasing space on those towers to wireless carriers, who in turn place antennas on the towers to provide wireless coverage for their customers. Since 2008, GMR has leased from the Commonwealth of Massachusetts an unzoned, undeveloped, triangular plot of land approximately 2,700 square feet in area and located between I-93 South and the on-ramp at Exit 3 ("the Site"). The Site is located close to the Blue Hills Reservation and the Carisbrooke Road neighborhood in the town of Milton.

GMR leased the Site with the intention of putting up a cell phone tower to improve wireless coverage in the area around Exit 3. Wireless carriers T-Mobile and MetroPCS had given assurances to GMR, in the form of letters of intent, that they would place antennas on the new tower. Both companies were desirous of this location because it would allow them to improve their wireless coverage around Exit 3, an area in which each had identified a significant coverage gap that resulted in dropped calls when customers entered the area and an inability to reliably place calls from within the area of inadequate service. In order to begin construction, however, GMR needed to win approval from both the BOA and the MCC.

GMR applied to the BOA in May of 2009 for permission to build a 140-foot cell phone tower on the Site. According to its application, the height was necessary to accommodate video equipment from the Massachusetts Highway Department, along with five antenna mounts to be used by up to five different wireless carriers. GMR also submitted evidence tending to show that both T-Mobile and MetroPCS had significant coverage gaps in the area near Exit 3 and that the Site was the only feasible location on which a cell phone tower could be placed to fill in the gaps. There was some community opposition to the proposal that appears to have been based primarily on aesthetic concerns: the objectors were upset that the tower would have been visible from multiple locations in

the Blue Hills Reservation, as well as from within the Carisbrooke Road neighborhood.

The BOA held several public hearings through the summer of 2009, with objectors maintaining that "the need for the tower did not outweigh the significant negative aesthetic effects." Green Mountain Realty, 688 F.3d at 46. On August 19, 2009, the BOA voted to deny the application and issued a written opinion on September 24, 2009, which "emphasized the public opposition to the proposed tower and the importance of protecting the character and aesthetic beauty of the Blue Hills Reservation." Id. In a similar vein, the BOA found the proposed 140-foot tower could be seen from the Carisbrooke Road neighborhood and "would substantially detract from the character of the neighborhood." Id. (internal quotation marks omitted). The BOA further found that "existing [wireless] coverage while not perfect is reasonable and adequate under all of the circumstances." Id. (internal quotation marks omitted). Finding that GMR failed to demonstrate its desired tower would "promote[] the safety, welfare, or aesthetic interests of the Town of Milton," the BOA concluded the proposal was "not in harmony with the [zoning] Bylaw" and denied GMR's application. Id. (internal quotation marks omitted).

While all this was going on, GMR was also attempting to win approval from the MCC, another necessary prerequisite to construction because the Site is considered to be in a riverfront

-7-

area given its proximity to the Blue Hills River. Green Mountain Realty, 688 F.3d at 47. The MCC ultimately denied GMR's application on September 19, 2009, finding that it could not approve the proposal given GMR's failure to provide it with any information about potential alternative sites. Id. at 48. Like the BOA, the MCC also cited aesthetic reasons: reiterating that it has a role in preserving aesthetics, the MCC explicitly stated that "the height of the tower was, and remains, an important factor for consideration." Id. (internal quotation marks omitted). The MCC further called GMR to task for supposedly failing to provide requested data about whether a shorter tower would solve the coverage gap. Id. It noted that because the Site was already in a "degraded" condition as a result of I-93, the wetlands there "are in greater need of protection, rather than less." Id. (internal quotation marks omitted). Accordingly, and like the BOA before it, the MCC denied GMR's application to build a 140-foot cell phone tower. Id.

**b. Federal Litigation Begins**

GMR appealed to the district court, arguing that the BOA and MCC decisions violated various provisions of the Telecommunications Act. Green Mountain Realty, 688 F.3d at 48. First, GMR argued that the two denials were not based on substantial evidence in contravention of the requirement that "[a]ny decision . . . to deny a request to place, construct, or

modify personal wireless service facilities shall be . . . supported by substantial evidence contained in the written record." Id. at 49 (quoting 47 U.S.C. § 332(c)(7)(B)(iii)) (internal quotation marks omitted). GMR further argued that the denials ran afoul of the Act's ban of local decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services." Id. (quoting 47 U.S.C. § 332(c)(7)(B)(i)(II)) (internal quotation marks omitted). Finally, GMR claimed the BOA's denial exceeded its authority and was arbitrary and capricious, all in violation of state law. Id.

After the parties conducted discovery, the district court denied GMR's motion for summary judgment and granted Milton's motion for summary judgment. Id. The court found that both denials were supported by substantial evidence in the administrative record. With respect to the BOA, the district court found that GMR "failed to show that existing service was inadequate" and did not "adequately explore alternative sites," that the BOA was justified in denying the application due to aesthetic concerns, and that GMR "had not demonstrated that its proposal was the only feasible plan." Id. The court upheld the MCC's decision on the grounds that substantial evidence supported its conclusion that the proposed construction would adversely affect the surrounding wetlands. Id. The court did not separately address GMR's claims that the MCC's decision also constituted an

effective prohibition of wireless service and that the BOA's decision should be overturned on state law grounds. Id.

On appeal, we upheld the district court's finding that substantial evidence supported the BOA and MCC denials. Green Mountain Realty, 688 F.3d at 44. However, this did not end the matter. Even though supported by substantial evidence, the denials could violate the Telecommunications Act if they resulted in the effective prohibition of the provision of wireless services. See id. at 57. After reviewing the record, we concluded that the district court did not adequately consider GMR's federal claims, and remanded for further proceedings, "leav[ing] it to the discretion of the district court whether to evaluate the claims on the current record or allow the parties to submit additional evidence." Id. at 60-61.

**c. Further Action in the District Court**

Taking up the matter again, the district court provided the parties with an opportunity to submit additional evidence with respect to the effective prohibition claim. The parties developed additional evidence and cross-moved for summary judgment. The court heard oral arguments on May 15, 2013, and took the matter under advisement.[1] Before issuing its decision, the district court

---

[1] The hearing consisted of legal arguments from counsel for both sides based upon the documentary evidence submitted in support of the pending summary judgment motions. To date, no evidentiary hearing has ever been held in the district court.

became aware that T-Mobile and MetroPCS had merged into a single company, T-Mobile US, Inc. ("T-Mobile US"), in or around May 2013.[2] The court ordered the parties to "submit supplemental briefs and, if necessary, documentary evidence on how this merger should affect the pending summary judgment motions."

GMR submitted its supplemental brief on August 30, 2013. Although GMR took the position that the question should be "decided on the facts supported by the affidavits as they existed in 2009," it conceded the district court had "discretion to take into account new facts described herein [i.e., GMR's supplemental brief] to fashion an appropriate remedy." In that regard, GMR maintained that, even post-merger, T-Mobile US continues to have a coverage gap in the area around Exit 3, that the Site was the only available and technically feasible site, and that "to close this significant gap, [T-Mobile US] needs to mount its antenna no lower than 117 feet."

---

[2] It appears from the district court's decision that it obtained this information from press releases and filings made by T-Mobile with the federal government. GMR intimates in its brief that the district court erred by taking judicial notice of these materials. However, GMR has not previously and does not now contest any of the facts derived from these materials and upon which the district court relied. Indeed, it is clear from its briefs and counsel's statements at oral argument that GMR concedes that T-Mobile and MetroPCS have merged and that MetroPCS users will be migrated to the T-Mobile network. Accordingly, GMR has waived any argument as to the propriety of the judicial notice taken in this case.

GMR submitted an August 29, 2013, affidavit of its owner and president, Victor Drouin, to support the claims that T-Mobile US continues to have a significant coverage gap near Exit 3 and that "[t]o close this significant gap, [T-Mobile US's] antenna cannot be any lower than 117 foot centerline on the proposed tower." GMR further provided an August 27, 2013, letter written on T-Mobile letterhead confirming that the merger closed on May 1, 2013. The letter went on to state that there was still a significant gap in T-Mobile's wireless coverage at and around the Site and that, according to radio frequency testing, its antenna must be mounted no lower than 117 feet in order to remedy the gap.

GMR also resubmitted earlier affidavits from Drouin describing the Site and explaining that GMR reviewed possible alternative solutions and sites, but that there are no feasible alternatives to constructing a cell phone tower at the Site. The affidavits also indicated that in order to obtain a lease on the Site, GMR had to agree to install a camera--which "must" be mounted at a height of 90 feet--for the Massachusetts Highway Department. GMR concluded with a request for an injunction requiring Milton "to issue all permits necessary to construct a PWCF on GMR's Site at the height necessary to close the existing coverage gaps."

The summary judgment record contained additional evidence relevant to the tower's required height. GMR had previously submitted an undated expert report authored by a radio frequency

-12-

engineer, Scott Heffernan, which opined to the existence of a "very significant gap" in T-Mobile's wireless coverage in the area around the Site. GMR's expert indicated that a "propagation analysis" had been performed, and it confirmed that mounting an antenna at a height of 120 feet would eliminate the significant gap in T-Mobile's coverage.[3] The district court also had available for its consideration excerpts of Heffernan's deposition, at which he testified that an antenna mounted at 90 feet would be high enough to eliminate the coverage gap. Finally, one of Drouin's affidavits described a "crane test" done to determine the tower's visibility from nearby locations, which showed that "only the top twenty feet of the proposed 140-foot tower would be visible around the tree line from the surrounding areas."

Milton submitted its own supplemental brief as well. Milton did not specifically contest any of the factual representations that we just mentioned. Milton took a different tack instead, arguing that MetroPCS no longer had a significant gap in its coverage in light of the merger and the anticipated "migration" of MetroPCS customers to the T-Mobile network. With respect to T-Mobile US, Milton argued that there was no longer any need for a 140-foot tower, as the requested height had been

---

[3] A "propagation analysis," according to the expert report, uses computer software that "calculates frequency strength over distance taking into account geographical and topographical features that contribute to signal loss" to determine the expected area of coverage provided by an antenna at a given height.

dictated entirely by MetroPCS's requirements.  Milton's position was that the 140-foot tower was no longer necessary to close the coverage gap, meaning that the BOA's and MCC's denials did not effectively prohibit T-Mobile US from providing wireless service in Milton.[4]

Both parties submitted their supplemental briefs and attached exhibits on August 30, 2013.  The district court issued its written decision approximately one week later and without further hearing.

Of significance for this appeal, the district court first concluded that GMR "has shown as a matter of law that in Fall 2009, there were significant gaps in MetroPCS and [T-Mobile US] coverage in the affected area, and no feasible alternative existed for resolving the MetroPCS coverage gap other than a 140-foot tower at the Site."  The district court reasoned that if its effective prohibition analysis took into account only those facts in existence at the time the BOA and MCC denied GMR's application, GMR "would be entitled to summary judgment against both boards."

The district court did not end its inquiry there, but instead determined it should also consider subsequent developments to decide whether Milton had effectively prohibited wireless services.  The court first found that even after the merger, a

_____

[4] Milton also intimated that T-Mobile US may no longer even be interested in the Site following the merger.  This argument has been abandoned on appeal.

-14-

significant gap remained in T-Mobile US's coverage around the Site. It further found that "there are no feasible alternative locations for the proposed tower" apart from the Site. The court felt, though, that GMR no longer needed to rectify MetroPCS's coverage gap thanks to the merger. It recounted the evidence in the record indicating that T-Mobile US's gap could be solved with a 117-foot or 120-foot tower, ultimately concluding that a shorter tower at the Site is a reasonable alternative to the original 140-foot proposal. The court then found that the existence of this alternative necessarily meant that the BOA's and MCC's denials did not effectively prohibit the provision of wireless services. Finally, the court noted that there was no evidence showing the BOA or MCC would be predisposed to refusing a new application for a shorter tower.

When all was said and done, the court denied GMR's motion for summary judgment, granted Milton's motion, and entered judgment in favor of Milton. This timely appeal followed.

## II.

## DISCUSSION

### a. Standard of Review

We are called upon to review the district court's disposition of the parties' cross-motions for summary judgment. Cross-motions for summary judgment require the district court to "consider each motion separately, drawing all inferences in favor

-15-

of each non-moving party in turn."  D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2013) (citing Merchants Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998)); but see Puerto Rico Am. Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 133 (1st Cir. 2010) (noting that when "cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time," but that should it instead "opt to consider them at different times, it must at the very least apply the same standards to each").

Our review of the district court's resolution of the competing motions is de novo.  Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 558 (1st Cir. 2010).  We will affirm a grant of summary judgment "only if the record discloses no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).  Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose "existence or nonexistence has the potential to change the outcome of the suit."  Id. (citations and internal quotation marks omitted).  We also bear in mind that just because each party has moved for summary judgment, this "do[es] not necessarily indicate agreement by the parties as to the material

facts in the record."  ATC Realty, LLC v. Town of Kingston, N.H.,
303 F.3d 91, 99 (1st Cir. 2002).

**b.  The Telecommunications Act of 1996**

We begin with an overview of the relevant provisions of
the Telecommunications Act.  The Act, we have said, represents "an
exercise in cooperative federalism . . . [that] attempts, subject
to five limitations, to preserve state and local authority over the
placement and construction of [telecommunications] facilities."
Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14,
19 (1st Cir. 2002).  The relevant limitation here is the Act's
mandate that, "in regulating the placement and construction of
[wireless] facilities, a state or local government or
instrumentality 'shall not prohibit or have the effect of
prohibiting the provision of personal wireless services.'"  Id.
(quoting 47 U.S.C. § 332(c)(7)(B)(i)(II)).  It is well-established
in this Circuit that "local zoning decisions . . . that prevent the
closing of significant gaps in the availability of wireless
services violate the statute."  Id. at 20.  This is true even where
a local authority's denial of an individual application pursuant to
its own local ordinances is supported by substantial evidence.  Id.

The question of whether or not a local denial constitutes
an effective prohibition violative of the Act is definitively
answered by the district court, not the local zoning authority.
Id. at 22.  Indeed, nothing in the Telecommunications Act

-17-

"expressly authorize[s] local zoning boards to consider whether individual decisions amount to an 'effective prohibition.'" Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 630 (1st Cir. 2002) (citing 47 U.S.C. § 332(c)(7)). Accordingly, where a local authority purports to pass upon the issue, the federal courts afford it "[n]o special deference." Id. Because the issue is decided by the district court in the first instance, we review the district court's decision rather than that of the local authority. Green Mountain Realty, 688 F.3d at 58.

When conducting the "effective prohibition" inquiry, district courts "may well require evidence to be presented in court that is outside of the administrative record compiled by the local authority." Nat'l Tower, 297 F.3d at 22 (citing Town of Amherst, N.H. v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 16 n.7 (1st Cir. 1999)). To that end, they are "free to consider additional evidence" beyond that which was introduced at the local level. Second Generation Props., 313 F.3d at 629. Indeed, when we remanded this case to the district court to decide the effective prohibition issue, we explicitly left it within "the discretion of the district court whether to evaluate the claims on the [then-current] record or allow the parties to submit additional evidence." Green Mountain Realty, 688 F.3d at 60.

Upon remand, the district court ordered two rounds of supplemental briefing before making additional findings of fact,

denying GMR's motion for summary judgment, and granting Milton's motion for summary judgment.  When the district court grants summary judgment on an effective prohibition claim, our review of that decision is de novo.  Nat'l Tower, 297 F.3d at 22.  Where, however, the district court takes new evidence and makes its own evidentiary findings as part of the process, we review "its factual findings for clear error and its legal conclusions de novo."  Id.

## c. Analysis

Our previous opinion in 2012 remanded this matter for the district court to consider GMR's effective prohibition claims.  In that regard, when it considered the parties' cross-motions for summary judgment, the district court focused exclusively on the merger's elimination of MetroPCS's coverage gap. Specifically, the court found that MetroPCS no longer has a significant gap in its coverage because all of its customers are slated to be taken off its network and folded into T-Mobile's by the end of 2015.  The district court then reasoned that, in light of this new development which had not been in the cards back in 2009, the BOA's and MCC's denial of the tower application did not effectively prohibit MetroPCS from providing wireless services in Milton.

Although the district court addressed the effective prohibition claim with respect to MetroPCS, it did not consider the changed circumstances from the perspective of T-Mobile US.  From the record, it appears that the district court felt that once it

determined MetroPCS's significant gap was no longer in play, it had no need to inquire further. By not looking deeper, however, the district court failed to determine whether the 2009 denials violated the Telecommunications Act by "prevent[ing] the closing of significant gaps in the availability of wireless services" provided by T-Mobile US. Nat'l Tower, 297 F.3d at 20. Failure to adjudicate this aspect of the claim constituted an error of law. See Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 49 (1st Cir. 2010) (recognizing that effective prohibition claims must be evaluated from the standpoint of "the individual carrier's network"); Second Generation Props., 313 F.3d at 634 ("The fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers.").

Because we may affirm the district court's grant of summary judgment on any basis apparent in the record, Rodriguez v. Municipality of San Juan, 659 F.3d 168, 179 (1st Cir. 2011), the district court's error does not, by itself, require reversal. We must now consider whether the uncontested facts in the summary judgment record entitled Milton to judgment as a matter of law. They did not.

In order to withstand Milton's motion, GMR needed to come forward with evidence that would allow a finder of fact to conclude

that the 2009 denials had the effect of prohibiting T-Mobile US from providing wireless service around Exit 3.

Whether or not an effective prohibition has occurred depends on each case's unique facts and circumstances, and "there can be no general rule classifying what is an effective prohibition." Second Generation Props., 313 F.3d at 630. We have, however, discussed certain "circumstances where there is a prohibition 'in effect.'" Id. "[W]here the plaintiff's existing application is the only feasible plan . . . denial of the plaintiff's application might amount to prohibiting personal wireless service." Id. (citations and internal quotation marks omitted). In attempting to show that local authorities have rejected the only feasible plan, a carrier bears "the 'heavy' burden 'to show from the language and circumstances not just that this application has been rejected but that further reasonable efforts [to find another solution] are so likely to be fruitless that it is a waste of time even to try.'" City of Cranston, 586 F.3d at 50 (emphasis and alteration in original) (quoting Town of Amherst, 173 F.3d at 14).[5]

---

[5] We also recognized in Second Generation Properties that an effective prohibition occurs where a "town sets or administers criteria which are impossible for any applicant to meet." 313 F.3d at 630. GMR does not argue that this is what happened here.

Turning to the summary judgment record here, it is apparent that the vast majority of facts are undisputed.[6] The district court found--and the parties do not contest--that there remains a significant gap in T-Mobile US's service in the area around Exit 3 in spite of the merger. Further, Milton does not challenge the district court's finding that the Site is the only feasible location on which to construct a cell phone tower to fill in T-Mobile US's significant coverage gap. Indeed, counsel conceded as much at oral argument. Thus, we hold that the evidence established that, as a matter of law, the only feasible solution to T-Mobile US's coverage gap is the construction of a cell phone tower on the Site.

The only remaining question of fact is the precise tower height required to eliminate the significant coverage gap. On that front, there was evidence in the record--none of which Milton

---

[6] The parties spend considerable time and energy arguing about whether the district court was bound to decide the effective prohibition claim based on the facts as they existed at the time GMR first applied to construct a 140-foot tower, or whether it was permissible for the court to consider changed, post-merger circumstances bearing on the continued existence of a significant coverage gap. This turns out to be much ado about nothing, however, as GMR conceded in its supplemental brief to the district court in August 2013 that the court had discretion to consider the current lay of the land in light of the merger. Moreover, the relief GMR requests on appeal--an injunction requiring Milton to permit construction of a 120-foot tower--is itself predicated on the changed circumstances resulting from the merger. Accordingly, GMR has waived any argument that the district court was limited to considering the facts as they existed at the time its application was denied. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

contests--that an antenna must be mounted at some height between 90 and 120 feet to eliminate T-Mobile US's coverage gap. We further note the existence of evidence that the Massachusetts Highway Department's camera "must" be mounted at a height of 90 feet, and it appears from Milton's appellate brief that it has conceded a wireless antenna would have to be mounted at a height of at least 100 feet. See Defs.-Appellee's Br. at 10 ("The lowest antenna mounting height for a wireless carrier would be at 100-feet."). The evidence in the record was sufficient to allow a reasonable finder of fact to conclude that Milton's denials effectively prevented T-Mobile US from closing its coverage gap in the area near Exit 3, in contravention of the Telecommunications Act. Accordingly, Milton was not entitled to summary judgment, and the district court erred in so finding.[7]

We have considered Milton's arguments to the contrary and we are not convinced. Milton first asserts that the district court properly granted its motion for summary judgment because GMR failed to show that the originally-proposed 140-foot tower is the "only feasible plan" in light of the merger between T-Mobile and MetroPCS, as MetroPCS no longer has a significant gap in coverage. Milton further argues that GMR should be required to return to the BOA and MCC with a brand new application for a shorter cell phone

_____

[7] Because there was evidence that the coverage gap could have been rectified by more than one tower height, it follows that GMR was not entitled to summary judgment on its own cross-motion.

tower.  These arguments, however, are based on the mistaken premise that the district court correctly granted Milton's summary judgment motion, and completely ignore the effective prohibition claim with respect to T-Mobile US.  We, therefore, reject them.  Simply put, Milton has done nothing to undermine our conclusion that a reasonable finder of fact could have found from the evidence in the record that Milton's denials effectively prohibited T-Mobile US from providing wireless service in the area around Exit 3.

**d.  Some Final Thoughts**

So that neither the parties nor the district court will be led astray, we address Milton's intimation that the BOA and/or MCC should have an additional opportunity to weigh in on the tower's ultimate height.  Such an outcome would not be in accordance with the text or spirit of the Telecommunications Act. What we said about the Act in <u>National Tower</u> over a decade ago bears repeating here:

> The statutory requirements that the board act within 'a reasonable period of time,' and that the reviewing court hear and decide the action 'on an expedited basis,' indicate that Congress did not intend multiple rounds of decisions and litigation, in which a court rejects one reason and then gives the board the opportunity, if it chooses, to proffer another.  Instead, in the majority of cases the proper remedy for a zoning board decision that violates the Act will be an order . . . instructing the board to authorize construction. . . .  In short, a board's decision may not present a moving target and a board will not ordinarily receive a second chance.

Our concern in National Tower about "multiple rounds of decisions" is even stronger here, as the record evidence demonstrates that the local boards would be compelled to permit construction of a cell phone tower on the Site. There is no genuine dispute that T-Mobile US continues to have a significant coverage gap in that area, that the Site is the only feasible location to construct a new tower, and that the tower must be somewhere between 90 and 120 feet high in order to fill in that gap. And the resolution of the only remaining question--the tower's height--is for the district court, not the BOA or the MCC, to answer. Id. at 22; City of Cranston, 586 F.3d at 52. Furthermore, there is no justification for further hearings on the local level given that the only issue to be resolved is a limited one to be resolved by the district judge. See Brehmer v. Planning Bd. of Town of Wellfleet, 238 F.3d 117, 121 (1st Cir. 2001) ("Finally, appellants have identified no practical benefit to sending the matter back to the Planning Board in order to have that body hold a hearing destined to result in the issuance of the special permit."); see also City of Cranston, 586 F.3d at 52-53 ("Ultimately the question is a practical inquiry into feasible, available alternatives.").

Here, the BOA and the MCC have already had their say. In fact, we determined their reasons for denial were supported by

-25-

substantial evidence. Nevertheless, these denials must give way in light of the evidence that they effectively prohibited T-Mobile US from providing wireless services in derogation of federal law. Accordingly, there is nothing else for Milton to decide in this matter, and the district court should resolve the effective prohibition claim within the contours set forth in this opinion. See Nat'l Tower, 297 F.3d at 22; City of Cranston, 586 F.3d at 52 ("Whether the carrier proves an effective prohibition has occurred is a factual question for the trial court to resolve."). It is also incumbent upon the district court to craft an appropriate remedy in light of the specific facts and circumstances appearing in the record.

## III.

### CONCLUSION

Given the existence of the one remaining issue of material fact, i.e., the necessary height of the tower, we must remand this matter to the district court for further proceedings with respect to GMR's effective prohibition claim. To resolve the claim, the district court--not the BOA, MCC, or any other organ of Milton's town government--is to determine whether the tower's height need be 90 feet, 117 feet, 120 feet, or something in between, in order to remedy the effective prohibition of wireless services caused by the BOA's and MCC's denial of GMR's application to build a cell phone tower. See Nat'l Tower, 297 F.3d at 22. In

accordance with 47 U.S.C. § 332(7)(B)(v), the district court is directed to hear and decide this matter on an expedited basis.

To sum up:  we **affirm** the district court's denial of GMR's motion for summary judgment, **reverse** its grant of summary judgment in favor of Milton, **vacate** the judgment entered in favor of Milton, and **remand** this matter for further proceedings consistent with this opinion.